UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

04  10384 DPW

| | |
|---|---|
| MICHELLE P. BURK, Derivatively on behalf of Sonus Networks, Inc, A Delaware Corporation, | No. |
| Plaintiff | **SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| HASSAN AHMED; EDWARD T. ANDERSON; PAUL J. FERRI; RUBIN GRUBER; PAUL SEVERINO; JOHN MICHAEL O'HARA; EDWARD N. HARRIS; STEPHEN NILL; and PAUL R. JONES; | MAGISTRATE JUDGE _Bowler_ |
| Defendants | **JURY TRIAL DEMANDED** |
| -and- | |
| SONUS NETWORKS, INC., A Delaware Corporation, | RECEIPT # _5-4/21_ <br> AMOUNT $ _150_ <br> SUMMONS ISSUED_(Ye)_ <br> LOCAL RULE 4.1_____ <br> WAIVER FORM_____ <br> MCF ISSUED_____ <br> BY DPTY. CLK. _____ <br> DATE._2/26/04_ |
| Nominal Defendant. | |

Plaintiff, by her undersigned attorneys, for her shareholder derivative complaint, alleges upon information and belief, except as to allegations about herself, which are based upon personal knowledge, as follows:

## NATURE OF ACTION

1.      This is a shareholder's derivative action brought on behalf of nominal defendant Sonus, a Delaware corporation with headquarters and principal place of business in Westford, Massachusetts. In this action, plaintiff, on behalf of Sonus, alleges that defendants, who are officers and/or directors of the Company, damaged Sonus by deliberately, in bad faith or recklessly: (i) implementing a sham system of internal controls completely inadequate to ensure proper recognition of revenue; (ii) causing the Company to issue false and misleading statements to the market regarding the Company's earnings and revenues; (iii) exposing the Company to

massive liability for securities fraud; (iv) damaging the Company's reputation: and (v) trading Sonus shares while in possession of material, non-public information regarding the true financial condition of the Company.

2.      On February 11, 2004, Sonus announced that the Company had identified several issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts. Each of these issues, the Company reported,  may affect the Company's publicly reported 2003 financial results, and possibly financial statements for prior periods. Prior to disclosing these adverse facts, defendants caused Sonus to sell a large number of shares in two public offerings, and certain insiders sold approximately $2 million of their personal holdings of Sonus shares. When the market opened for trading following the February 11, 2004 announcement, shares of the Company's stock fell as low as $5.02 per share, a decline of $1.67 per share or 24.9%. As alleged in detail herein, these revelations have severely damaged Sonus.

3.      Defendants' conduct was deliberate and undertaken in bad faith, and constituted breaches of their fiduciary duties to the Company. The acts and omissions alleged herein occurred during the period between April 9, 2003 and February 11, 2004, inclusive (the "Relevant Period"). By making Sonus appear more successful than it actually was, defendants secured their positions as officers and/or directors of a public company, as well as their continued lucrative employment and incentive-based cash and stock compensation. Defendants were also motivated by the desire to sell their personal holdings of Sonus stock and increase and maintain the value of their substantial personal holdings of Sonus shares.

## JURISDICTION AND VENUE

4.      This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. Section 1332.

5.      Venue is proper in this Judicial District because many of the acts and transactions alleged herein occurred in substantial part in this judicial district.

## PARTIES

6.     Plaintiff Michelle P. Burk held Sonus shares during the Relevant Period, and continues to hold Sonus shares. Plaintiff is a citizen of Ontario, Canada.

7.     Nominal Defendant Sonus is a Delaware corporation and maintains its principal executive offices at 5 Carlisle Road, Westford, Massachusetts 01886. According to its public statements, Sonus is a provider of voice infrastructure solutions for the new public network. The Company's products are a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks. By enabling voice traffic to be carried over these packet-based networks, the Company's products will accelerate the convergence of voice and data into the new public network. Sonus trades on the NASDAQ National Market System with 244 million shares outstanding.

8.     Defendant Hassan Ahmed ("Ahmed") has been president, CEO and a director of the Company since 1998. According to the Company's most recent proxy statement, Ahmed owns 8.4 million shares of the Company's common stock, or 4.1%, and options for an additional 674,000 shares. Ahmed is a citizen of Massachusetts.

9.     Defendant Edward T. Anderson ("Anderson") has been a director of the Company since 1997. According to the Company's most recent proxy statement, Anderson owns 563,000 shares of the Company's common stock, and in May 2002 was granted options to purchase 10,000 more shares. Anderson serves on the Audit Committee of the Board. During the Relevant Period, Anderson sold 65,000 shares of stock for over $448,000 in proceeds while in possession of material adverse inside information regarding the Company's financial results. Anderson is a citizen of Massachusetts.

10.     Defendant Paul J. Ferri ("Ferri") has been a director of the Company since 1997. Ferri serves on the Board's Audit and Compensation Committees. According to the Company's most recent proxy statement, Ferri owns 153,000 shares of the Company's common stock, and in May 2002 was granted options to purchase 10,000 more shares. Ferri is a citizen of Massachusetts.

11.     Defendant Rubin Gruber ("Gruber") is one of the founders of Sonus. He has been a director of the Company since 1997 and has served as Chairman of the Board since 1998. He also served as President of the Company from 1997 to 1998. According to the Company's most recent proxy statement, Gruber owns 3.9 million shares of the Company, and options for an additional 487,000 shares. Gruber is a citizen of Massachusetts.

12.     Defendant Paul Severino ("Severino") has been a director of the Company since 1999. Severino serves on the Audit and Compensation Committees of the board. According to the Company's most recent proxy statement, Severino owns 560,000 shares of the Company's common stock, and in May 2002 was granted options to purchase 10,000 more shares. Severino is a citizen of Massachusetts.

13.     Defendants Ahmed, Anderson, Ferri, Gruber and Severino are sometimes collectively referred to as the "Director Defendants."

14.     Defendant John Michael O'Hara ("O'Hara") has served as Vice President of Marketing since 2002. According to the Company's most recent proxy statement, O'Hara failed to timely file a form required by Section 16 of the Securities and Exchange Act of 1934 requiring him to report his appointment as an executive officer of the Company and his initial grant of options to purchase shares of the Company's stock. During the Relevant Period, O'Hara sold 68,500 shares of stock for over $480,000 while in possession of material adverse inside information regarding the Company's financial results. O'Hara is a citizen of Massachusetts.

15.     Defendant Edward N. Harris ("Harris") has served as Vice President of Manufacturing since 2002. During the Relevant Period, Harris sold 30,000 shares of stock for over $204,000 while in possession of material adverse inside information regarding the Company's financial results.  Harris is a citizen of Massachusetts.

16.     Defendant Stephen J. Nill ("Nill") has served as CFO and Vice President of Finance and Administration since 1999. According to a recent SEC filing, Nill owns 965,000 shares of Sonus stock. Nill is a citizen of Massachusetts. Nill signed each of Sonus' reports on Form 10-Q issued during the Relevant Period.

17.     Defendant Paul R. Jones ("Jones") has served as Vice President of Engineering since 2000. Jones owns 364,000 shares of the Company's common stock and options for an additional 200,000 shares. During the Relevant Period, Jones sold 100,000 shares of stock for over $857,000 while in possession of material adverse inside information regarding the Company's financial results. Jones is a citizen of Massachusetts.

18.     Defendants Anderson, O'Hara, Harris, and Jones are sometimes collectively referred to as the "Insider Trading Defendants."

19.     The Director Defendants and defendants O'Hara, Harris, Nill and Jones are sometimes collectively referred to as "the Individual Defendants."

20.     Each of the Individual Defendants, by virtue of his management and/or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto. As corporate fiduciaries, the Individual Defendants were required to exercise reasonable care and prudent supervision of the Company, including assuring the dissemination of truthful information concerning the business, operations, and financial reporting of Sonus.

21.     The Individual Defendants were required to supervise the preparation of Sonus' SEC filings and approve any reports concerning the company's financial condition and results of operations, including to assure that the Company complied with Generally Accepted Accounting Principles ("GAAP"). The Individual Defendants likewise had a duty of loyalty to the company to act in the best interests of the company and its shareholders.

22.     Each of the Individual Defendants directly participated in the management of the Company and/or was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements alleged herein, and/or was aware that the false and misleading statements were being issued regarding the Company's financial position and approved or ratified these statements.

23.     Because of each of the Individual Defendants' positions with Sonus, each knew and had access to non-public information about the business of Sonus, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents

(including Sonus's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or board of directors' meetings and committees thereof, and reports and other information provided to him in connection therewith.

24.     The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Sonus or to abstain from trading on such information.

## SUBSTANTIVE ALLEGATIONS

25.     On April 9, 2003, defendants caused the Company to issue a press release announcing Sonus' financial results for the first quarter of 2003, the period ended March 31, 2003. According to the press release, Sonus reported revenues of $16.0 million and a net loss of $4.4 million or $0.02 per share. According to defendant Ahmed:

> Our financial results for the first quarter reflected good progress toward our business objectives. We grew our revenues 27 percent over last quarter, and by continuing to manage our business with precision, we further narrowed our net loss. In Q1, we also continued to add new customers around the globe and made important additions to our product family.

26.     On April 22, 2003, defendants announced that they had completed a public offering of 20 million shares of the Company's common stock, raising $61 million.

27.     On May 9. 2003, defendants caused the Company to file its Form 10-Q for the first quarter of 2003 with the SEC, which confirmed the previously-announced financial results and was signed by defendant Nill. The Form 10-Q stated that "the accompanying unaudited condensed consolidated financial statements have been prepared by Sonus and reflect all adjustments, consisting only of normal recurring adjustments that in the opinion of management are necessary for a fair statement of the results for the interim periods." With respect to the Company's revenue recognition policies, the 10-Q stated as follows:

Revenue Recognition.
We recognize revenue from product sales to end users, resellers
and distributors upon shipment, provided there are no uncertainties
regarding acceptance, persuasive evidence of an arrangement
exists, the sales price is fixed or determinable and collection of the
related receivable is probable. If uncertainties exist, we recognize
revenue when those uncertainties are resolved. In multiple element
arrangements, in accordance with Statement of Position 97-2 and
98-9, we use the residual method when vendor-specific objective
evidence does not exist for one of the delivered elements in the
arrangement. Service revenue is recognized as the services are
provided. Revenue from maintenance and support arrangements is
recognized ratably over the term of the contract. Amounts
collected prior to satisfying the revenue recognition criteria are
reflected as deferred revenue.

28.     On July 10, 2003, defendants caused the Company to issue a press release

announcing Sonus' financial results for the second quarter of 2003, the period ended June 30,

2003. Sonus reported revenues of $21.4 million and a net loss of $3.2 million or $0.01 per share.

According to defendant Ahmed:

We are pleased with the progress that we made in the second
quarter, particularly with our 33% sequential revenue growth. We
executed across all areas of the business - broadening and
strengthening our customer base, expanding our leading product
offering, bolstering our balance sheet and advancing our drive to
profitability.

Our revenue growth, coupled with premier customer wins like
Verizon Communications underscores our belief that the packet
voice market is entering a new phase. Incumbent carriers are now
adopting packet voice solutions and Sonus Networks is proud to be
at the forefront of this transition.

29.     On August 14, 2003, defendants caused the Company to file its Form 10-Q for the

second quarter of 2003 with the SEC, which confirmed the previously-announced financial

results and was signed by defendant Nill. The Form 10-Q stated that "the accompanying

unaudited condensed consolidated financial statements have been prepared by Sonus and reflect

all adjustments, consisting only of normal recurring adjustments that in the opinion of

management are necessary for a fair statement of the results for the interim periods." The Form

10-Q repeated defendants' prior representations regarding revenue recognition, as follows:

> Revenue Recognition.
> We recognize revenues from product sales to end users, resellers
> and distributors upon shipment, provided there are no uncertainties
> regarding acceptance, persuasive evidence of an arrangement
> exists, the sales price is fixed or determinable and collection of the
> related receivable is probable. If uncertainties exist, we recognize
> revenues when those uncertainties are resolved. In multiple
> element arrangements, in accordance with Statement of Position
> 97-2 and 98-9, we use the residual method when vendor-specific
> objective evidence does not exist for one of the delivered elements
> in the arrangement. Service revenue is recognized as the services
> are provided. Revenues from maintenance and support
> arrangements are recognized ratably over the term of the contract.
> Amounts collected prior to satisfying the revenue recognition
> criteria are reflected as deferred revenue.

30.     On September 23, 2003, defendants issued a press release announcing that the

Company had completed a public offering of 17 million shares of common stock for proceeds of

over $125 million.

31.     On October 8, 2003, defendants caused the Company to issue a press release

announcing Sonus' financial results for the third quarter of 2003, the period ended September 30,

2003. Sonus reported revenues of $28.6 million and net income of $1.2 million, or $0.01 per

diluted share – its first quarterly profit ever. According to defendant Ahmed:

> This was a strong quarter for Sonus Networks, our fourth
> consecutive quarter of revenue growth. Our revenues grew 34%
> sequentially to $28.6 million, reflecting increased market demand
> for packet telephony and the expanding number of customers who
> have adopted Sonus' solutions. We achieved an important
> milestone in reporting our first quarterly profit on a GAAP basis.
> Additionally, we bolstered our balance sheet to capitalize on the
> opportunity ahead, adding $126 million to our cash and marketable
> securities through a common stock offering in September.

32.     On November 10, 2003, the Company filed its Form 10-Q for the third quarter of

2003 with the SEC which confirmed the previously-announced financial results and was signed

by defendant Nill. The Form 10-Q stated that "the accompanying unaudited condensed
consolidated financial statements have been prepared by Sonus and reflect all adjustments,
consisting only of normal recurring adjustments that in the opinion of management are necessary
for a fair statement of the results for the interim periods." With respect to revenue recognition,
the Form 10-Q again provided as follows:

> Revenue Recognition.
> We recognize revenues from product sales to end users, resellers
> and distributors upon shipment, provided there are no uncertainties
> regarding acceptance, persuasive evidence of an arrangement
> exists, the sales price is fixed or determinable and collection of the
> related receivable is probable. If uncertainties exist, we recognize
> revenues when those uncertainties are resolved. In multiple
> element arrangements, in accordance with Statement of Position
> 97-2 and 98-9, we use the residual method when vendor-specific
> objective evidence does not exist for one of the delivered elements
> in the arrangement. Service revenues are recognized as the services
> are provided. Revenues from maintenance and support
> arrangements are recognized ratably over the term of the contract.
> Amounts collected prior to satisfying the revenue recognition
> criteria are reflected as deferred revenues.

33.    Each of the statements regarding the Company's financial results for the first
three quarters of 2003 were false as they failed to disclose and/or misrepresented the following
material adverse facts (a) that defendants had improperly and untimely recognized revenue on
certain of the Company's customer transactions; (b) that defendants violated GAAP and the
Company's own internal policies regarding the timing of revenue recognition; and (c) as a result,
the Company's revenues, net income and earnings per share published during the Relevant
Period were materially false and misleading.

## THE TRUTH EMERGES

34.    On January 20, 2004, defendants announced that the Company would postpone
the release of its fourth quarter and full year 2003 financial results pending the completion of its
2003 audit, and that upon completion of the audit, the Company would reschedule the conference
call and provide further details.

35.    On February 11, 2004, more than 20 days after postponing its fourth quarter and full year results, after the close of regular trading, defendants announced as follows:

> In connection with the year-end audit, Sonus Networks and its independent auditors have identified certain issues, practices and actions of certain employees relating to both the timing of revenue recognized from certain customer transactions and to certain other financial statement accounts, which may affect the Company's 2003 financial statements and possibly financial statements for prior periods.
>
> The revenue issues identified relate to the proper timing of recognizing revenue from certain customer transactions, and not whether the sales can be recorded as revenue. For the customer transactions under review, the products have been delivered, customers are using the products in their networks and Sonus Networks has either received payment or is receiving payment for the products in the ordinary course. The Company is reassessing the proper periods in which revenue should be recognized for these transactions. Revenue or deferred revenue in periods previously reported could increase, decrease or remain unchanged in those periods as a result of this reassessment.
>
> In response to the issues identified, the Company has taken the following steps:
>
> -- The Company is performing a detailed review of the revenue timing issues and practices and of certain other financial statement accounts.
>
> -- The Audit Committee of Sonus Networks' Board of Directors is conducting an independent investigation, employing the services of Hale and Dorr LLP and PricewaterhouseCoopers.
>
> -- The Company has terminated certain non-executive employees.
>
> -- Sonus Networks has notified the Securities and Exchange Commission of the Company's independent investigation and is fully reporting the results of that ongoing investigation to the Commission.
>
> "We are deeply concerned and disappointed to have discovered that certain employees at Sonus Networks were engaged in behavior that violated our code of conduct and may have compromised the integrity of our financial reporting," said Hassan Ahmed, president and CEO, Sonus Networks. "The Company

responded promptly by taking appropriate measures to address
these matters. We assure our shareholders, customers and
employees that our management and Board of Directors are
committed to taking all necessary steps to complete our review in
an expeditious and comprehensive manner, and to prevent such
problems from occurring in the future."

At this time, Sonus Networks cannot provide an anticipated date
for the completion of its review or the year-end audit, or for the
rescheduling of the release of its fourth quarter and fiscal year
results for the year ended December 31, 2003.

36.     The next morning, when the market opened for trading, shares of the Company's
stock fell as low as $5.02 per share, a decline of $1.67 per share, or 24.9%, on extremely high
trading volume.

## DEFENDANTS' DISCLOSURES VIOLATED GAAP

37.     GAAP are those principles recognized by the accounting profession as the
conventions, rules and procedures necessary to define accepted accounting practice at a
particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)), states that financial statements filed
with the SEC which are not prepared in compliance with GAAP are presumed to be misleading
and inaccurate. Regulation S-X requires that interim financial statements must also comply with
GAAP, with the exception that interim financial statements need not include disclosure which
would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R.
§210.10-01(a).

38.     Defendants implicitly represented that the financial results they reported for the
Company during the Relevant Period were prepared in accordance with GAAP, and explicitly
represented that the reported results reflected all adjustments, consisting of normal recurring
accruals, necessary for a fair presentation thereof. As specified above, however, defendants'
representations concerning the Company's financial results during the Relevant Period were
false and misleading in numerous material respects:

(a)    Defendants falsely stated that the Company's financial statements fairly presented the Company's financial condition;

(b)    Defendants failed to disclose that the Company's internal controls were grossly inadequate and, as a result, the Company's ability to record, process, summarize, and report financial data in its financial statements was seriously deficient;

(c)    Defendants violated the principle that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, §34);

(d)    Defendants violated the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, §40);

(e)    Defendants violated the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it.  That principle is particularly significant in the context of publicly-traded entities such as Sonus. The officers of such companies voluntarily accept wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, §50);

(f)    Defendants violated the principle that financial reporting should provide information about an enterprise's financial performance during a period.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least in part, upon evaluations of past enterprise performance (FASB Statement of Concepts No. 1, §42);

(g)    Defendants violated the principle that financial reporting should be reliable and represent what it purports to represent.  The notion that information should be reliable as well as relevant is central to accounting (FASB Statement of Concepts No. 2, §§58-59);

(h)    Defendants violated the principle of completeness, which requires that nothing is left out of a company's financial statements that may be necessary to ensure that they validly represent underlying events and conditions (FASB Statement of Concepts, No. 2, §79); and

(i)    Defendants violated the principle that conservatism must be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, §§95, 97).

39.    Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## THE DIRECTOR DEFENDANTS' RESPONSIBILITY FOR INTERNAL ACCOUNTING CONTROLS AND FOR FINANCIAL REPORTING

40.    All of the Director Defendants had the responsibility to ensure that there existed at Sonus sufficient internal controls to maintain the accuracy of its reported financial results, including revenue recognition. Defendants Anderson, Ferri and Severino, in particular, as members of the Audit Committee during the Relevant Period, had the responsibility to ensure that Sonus had sufficient accounting controls to insure the accuracy of its reported financial results. According to Sonus' SEC filings, the Audit Committee, among other things, "reviews the financial information which will be provided to shareholders and others, the systems of internal controls which management and the Board of Directors have established," and "Sonus' audit and financial reporting practices and procedures." [emphasis supplied]. According to the Company's audit committee charter:

> The primary purpose of the Audit Committee (the "Committee") is to assist the Board of Directors of the Corporation (the "Board") in fulfilling its oversight responsibilities to its stockholders and to the investment community by reviewing:

-the financial reports and other financial information provided by the Corporation to its stockholders, to any governmental body or to the public;

-the Corporation's systems of internal accounting and financial controls and disclosure controls and procedures;

-the Corporation's auditing, accounting and financial reporting processes generally;

-the independence, qualifications and performance of the Corporation's independent auditor; and

-any legal compliance and ethics programs established by management and/or the Board.

41.    Furthermore, as members of the audit committee, defendants Anderson, Ferri, and Severino were charged, according to Appendix D to Statement on Auditing Standards No. 55, Consideration of the Internal Control Structure in a Financial Statement Audit ("SAS 55"), with objectives such as (i) making certain that "[t]ransactions are recorded as necessary . . . to permit preparation of financial statements in conformity with generally accepted accounting principles . . . and to maintain accountability for assets," and (ii) making certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

42.    As described in SAS 55, the applicability and importance of specific control environment factors, accounting system methods and records and control procedures that an entity should establish should be considered within the context of such criteria as an entity's size, its organization and ownership characteristics, the nature of its business, the diversity and complexity of its operations, the entity's method of processing data, and its applicable legal and regulatory requirements. The larger the entity, the more complex, diverse and sophisticated the entity's business becomes, and the greater is the importance of accounting systems and controls. Moreover, public ownership of such an entity customarily requires a sophisticated internal control structure to ensure that transactions are accurately recorded and that, prior to the public

disclosure of any financial information, such transactions are compared to the existing assets to eliminate any discrepancies between the recorded and actual amounts.

43.     According to SAS 55:

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions. [emphasis supplied].

44.     When management permits a condition to exist in the company's internal control structure such that:

> the design or operation of one or more of the internal control structure elements does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements . . . may occur and not be detected within a timely period by employees in the normal course of performing their assigned functions,

such condition is defined by Statement on Auditing Standards No. 60, Communications of Internal Control Structure Related Matters Noted in an Audit ("SAS 60"), as a "material weakness" in the company's internal control structure.

45.     Due to the Director Defendants' total abdication of their duties as members of the Board and/or the Audit Committee, they permitted material weaknesses in the Company's internal control structure such that the Company improperly recognized revenue.

## INSIDER TRADING ALLEGATIONS

46.     As a result of defendants' false and misleading statements, Sonus' stock traded at artificially inflated levels through the Relevant Period. The Insider Trading Defendants knew or recklessly disregarded that revenues were being inflated through improper accounting, and that the Company lacked adequate internal controls to properly recognize revenue.

47.    Notwithstanding their access to this information as a result of their status as directors and/or officers of the Company and their corresponding duty either to refrain from trading or to disclose the adverse material facts set forth herein, the Insider Trading Defendants sold Sonus shares at artificially inflated prices while in possession of material, nonpublic information. This insider trading during the Relevant Period is summarized below:

| Name | Date | No. Shares Sold | Avg. Price | Approx. Proceeds |
|---|---|---|---|---|
| Edward T. Anderson | 7/18/03 | 32,378 | $6.85 | $221,789 |
| | 7/18/03 | 33,206 | $6.84 | $227,129 |
| | | 65,584 | | $448,918 |
| John Michael O'Hara | 7/22/03 | 15,000 | $6.95 | $104,250 |
| | 7/22/03 | 15,000 | $7.03 | $105,450 |
| | 7/22/03 | 15,000 | $6.82 | $102,300 |
| | 7/22/03 | 10,000 | $6.92 | $69,200 |
| | 10/22/03 | 5,000 | $7.90 | $39,500 |
| | 10/22/03 | 5,000 | $7.85 | $39,250 |
| | 10/22/03 | 3,750 | $7.91 | $29,662 |
| | | 68,750 | | $489,612 |
| Paul Jones | 10/10/03 | 100,000 | $8.57 | $857,000 |
| Edward Harris | 7/18/03 | 30,000 | $6.81 | $204,300 |
| Totals | | 364,334 | | $1,999,830 |

48.    In addition to the insider trading alleged above, according to several SEC filings made in February 2004, defendants Ahmed, Gruber, Nill, and Anderson gifted substantial holdings of Sonus shares during the Relevant Period.